May it please the Court, my name is Patricia Hsu of the Legal Aid Society Employment Law Center, and I'm counsel for Appellant Stéphane Moreau, who is in the courtroom today. I would like to reserve five minutes, if I might. The principal issue in this case is whether Air France is a joint employer of the ground handling service company employees who provide catering, cleaning, cargo, baggage, and handling services to Air France. This is a question of law that can be determined on the basis of this record, as this and other courts have done on joint employment cases in the matter of Torres Lopez v. May, Bonnet v. California Health and Welfare Agency, and Antinor v. DNS Farms. It is important to keep in mind that Appellant is not asking that this court find as a matter of law that all of the employees of any single ground handling service company are joint employees, only those that we have identified as providing service to Air France. And even then, based on the undisputed record here, there is only a handful, only a handful are needed. Seven are needed to bring Air France within the 50 minimum employee requirement under the Family and Medical Leave Act. We contend that Air Ground's 13 employees, Ogden's 15 employees, and Dynair's 16 employees bring Air France within that requirement. What is at stake here for my client is his right to take an unpaid leave. The task before the court today is to decide the appropriate factors to be used in analyzing the joint employment test under the Family and Medical Leave Act. And of course, one must always start with the statute. Here are the definitions of the terms employee and employee under the FAMLA are directly taken from its sister statute, the Fair Labor Standards Act. Employee means to suffer or permit to work and has a much broader definition than the common law definition, which requires direct supervision and control. Can we clear a little underbrush out here? Did Air France hire any of these people? No, it did not. Pay them? It paid them overtime indirectly per the contract. Set their hours of work? The Air France flights determined whether people worked overtime, but it did not set them per se in the traditional way. These people by and large were hired by other companies, supervised by them, paid by them, disciplined by them. Did Air France have the ability to terminate these people? No. But you're saying something else about what they did renders them an employee in the meaning of the Family and Medical Leave Act? Yes, I do. And what is that? It's the joint employment regulation coupled with the FAMLA. Tell us exactly which of the regulations you're relying upon. I'm relying on the joint employment regulation, Your Honor, which can be found at Section 825.106. That joint employment regulation specifically states that separate businesses, that is, distinct entities with separate owners, managers, and facilities are covered by the language of this regulation. That regulation coupled with the expansive interpretation of the terms employee and employee, as the Supreme Court has recognized in Darden, coupled with the legislative history of the Family and Medical Leave Act, which confirms that those definitions specifically referenced to the FLSA are to be interpreted similarly under this act. I submit to you, Your Honor, that if you look at the language of the joint employment regulation, which is the result of lengthy comment period where people submitted comments to the Secretary of Labor, what you will find is that the relationship between Air France and the ground handling service company personnel tracks the FAMLA joint employment regulation very closely. Here the ground handling service company personnel perform work which simultaneously benefits two or more employers. Their work benefits the primary employers, the ones that hire them, that receives compensation from the contract, but it also benefits Air France because Air France receives the ground services. That's kind of like the people who supply the fuel, the diesel fuel, I mean the jet fuel. It is not exactly, Your Honor, because we are not asserting that Air France has asserted any control over those particular employees. They let them crawl all over those airplanes at will? Pardon me, Your Honor? You think Air France lets them crawl all over their airplanes at will with hobble boots on? No, Your Honor. No, I think they probably tell them how to put gasoline in their airplanes, although I don't hope they don't put gasoline in a jet airplane. Jet might be right, Your Honor. I'm not sure whether that's in the record. I'm trying to find out what these people do that employees of every company that merchandises to Air France don't do. Well, what we know is what these employees provide to Air France in terms of services. Sure. They do all the cleaning up of the airplanes, don't they? The cleaners clean. And we have, for example, with AeroGround, which provides cargo handling for Air France, if you were to look at the record, it is clear that Air France provides training regarding how it wants that cargo handling to take place. Of course. And, in fact, every AeroGround employee who handled dangerous goods has to attend an Air France training. And what we are saying is that, in this instance, because of the degree of supervision and control and training that Air France provided and required its ground handling service companies to perform, that is one of the bases for finding that these are joint employees as provided for under the joint employment regulation. And they can send to do the cleaning anybody who had met those requirements. Well. I think they can. The cleaners who comply with Air France's strict requirements can clean the plane if they do so according to how Air France wants it done. Air France does not say on this record to the cleaning group, you must send Jane Doe, Sam Smith, and Fred Rowe to clean the plane. Those are the people we want. We won't take anybody else. It does not specify. They tell them, you have to have four people to clean this plane or whatever the number is. That is correct. And within the AeroGround contract, there are specified positions. And that means that those are dedicated employees from AeroGround who work specifically on the Air France contract. You referred to the FLSA. You're familiar with the Bonnet case, Bonnet v. California Health and Welfare? Yes, Your Honor. That case identified four factors. Right. Whether the employer had the power to hire and fire the employees. You've conceded that's not present, correct? That's correct. Supervised and controlled employee work schedules or conditions of payment. Well, as I mentioned before, to the extent that it is written in the contracts, and I believe the overtime provision is written in the Dynair contract, and to the extent we have extensive testimony from Mr. Ballou that overtime was, in fact, paid to ground handling service company employees when the plane was delayed for a variety of reasons, I would suggest that Air France does, in fact, pay overtime. And let me interrupt you. Doesn't that contract provide, and you know and I don't, I'm asking, that if our employees have to work overtime in order to service your planes, you're going to have to reimburse us enough money to pay that overtime? That's correct. Yeah, well. But that's what it's. I thought of a cost-plus basis contract. Well, what it does in the contract is actually specify what the overtime rates will be for particular employees. They don't leave it open. Of course, if it turns out that the labor union agreement next year provides more overtime, well, they'll have to amend this contract, I suppose. But determining whether they work overtime was going to be up to their employer. Well, in part, Your Honor, it's determined by the flight schedules. Well, I mean, that determines whether you're going to have to have somebody there working. That's correct. Now, if you've got somebody who's already worked his 8 and 40 or whatever overtime is these days, they could take him off the job and put somebody out there who was not working overtime, couldn't they? That's correct, Your Honor. So they decide whether they'll pay overtime in order to accomplish the contract. Well, that's not exactly what Mr. Ballew testified to. He had testified that if he reviews the overtime after the fact and he decides whether, in fact, it is meritorious or reasonable, whether, in fact, the work was done. But what I'm suggesting to you is that you don't need to rely on you and actually shouldn't rely on the four-part agency test here. That is way too narrow a definition under the Family and Medical Leave Act. It's way too narrow a definition under the Fair Labor Standards Act. The Supreme Court in Darden made that very clear. And now you have a joint employment regulation that is entitled to deference by this court. It is the law that determines joint employment status under the Family and Medical Leave Act. It is entitled to deference, and I really don't believe that the appellees are challenging that at all. What they are challenging is that portion of the regulation where it says separate businesses can be joint employers. Indeed, in many of the cases, in Bonnet, in Torres Lopez, you would not have found joint employment if, in fact, you had to require that both employers in that instance paid, hired, fired, set wages, and maintained the employment records. I'm worried that some of these people who work for these companies that provide the service, if their employer wouldn't give them family leave, could sue Air France for it. Is that right? No, they couldn't. And that's a very good point, if I might clarify that distinction. What this joint employment regulation says, as it pertains to Air France, which is the secondary employer here, is this. If you, in fact, meet the definition of joint employer, as stated here, you must then count those actual employees from the ground-handling service companies that help you reach that 50-employee threshold. Air France is not required to provide leave to any of the ground-handling service company employees just as Ogden, Dynair are not required to provide leave to my client. All that is required is that they be counted for purposes of the 50-employee threshold. So as long as they're providing any kind of service to Air France's regular employees, its customers, they're in the number? No, Your Honor. I think it's more than just any kind of service. I think, again, you have to look at what the regulation says in terms of whether there's common control here. And there is common control. There is no evidence in this record whatsoever that any other airline in the world conducts its operations in the way Air France does, the way it provides its own extensive mandatory training, the way it watches how the employees actually perform their work and then tells them when they're not doing something correctly, the way it verifies that all the work is done correctly and according to Air France's standards. And so actually – You don't think this happens at other airports where an airline has one flight a day? No, Your Honor. There's no evidence in the record to that except for a statement that was made by Reuben Martin. And if I might, Your Honor, I would actually like to read that for you. Reuben Martin worked at Ogden for about nine years before it became Sky Chefs in the catering department. And he was the coordinator for the Air France account. This is what he stated in his declaration of the excerpt of record, page 2245, paragraph 17. In my opinion and based on my experience providing catering services to airlines, Air France monitored and supervised Ogden Sky Chefs personnel more closely than did the other airlines with which Ogden Sky Chefs was under contract. For example, in the six months that I have been assigned to Air Canada, Air Canada has sent only one employee into the Sky Chefs kitchen on a single occasion. I think what you will find here with Air France is extremely close supervision and monitoring. So a company that cares more about quality and customer service would fall closer to the line of these contract employees being included in the count and someone who didn't would be outside that. Well, Your Honor, there is testimony that Air France prides itself on its food and its wine. There is also testimony that it markets itself in that way. And the point is that it has chosen to do business in this way. Not every company will necessarily choose to do business in this way. In fact, Mr. Rosenberg, who is Air France's expert witness, stated that the standard industry protocol is that the ground handling service companies maintain absolute control over the work and working conditions of all of its employees. Even the district court did not find that, Your Honor. So did I answer your question, sir? Yes, ma'am. Okay. And so what we are doing is we've put forward a number of different factors for the court. And the court has to select the factors that it believes are relevant here given this airline industry, given the joint employment regulation. And I really urge you to look at that closely, because I think that this situation tracks that regulation to the T. Our proposed task is to look at the nature and degree of control and supervision exercised by the secondary employer, Air France, over the workers. Two, to look at the permanence or duration of the working relationship between the primary and the secondary employers. Three, look at whether the workers perform repetitive routine tasks. Four, look at the extent to which the services provided by the workers are integral to the secondary employer's businesses. Five, whether the secondary employer's premises and equipment are used for the work. And the extent of the primary employer's work to the secondary employer. The other thing I want to mention to you, in addition to the close supervision. Listen, to every one of those, and I'm trying to figure out why the people who fuel the aircraft are not, would not be included in this count. Because they, because Air France does not control the way, manner in which they do that work. There's no evidence in the record that any other employee, security worker. I'm just talking, I know they're not in the suit. Right. For these calculation purposes. But why wouldn't they be under your articulated test? Well, if in fact, Your Honor, we had evidence that they were scrutinized and supervised in the way that the other employees were perhaps where they would be. But there is no evidence to that effect. And we don't believe that that, in fact, Air France exercises that kind of control over them. This kind of control I'm talking about is daily interaction. This is very different, I think, than somebody that fuels an airplane, than a security worker in an airport, for example. I'm not sure whether I've answered your question. Probably the most important thing, one of the most important things for you to keep in mind, is that when you're looking at this test, no one factor is decisive. We were guided by the principle that the list of factors is merely a guide, not etched in stone, as the Supreme Court said, and that you should look at the quality of the factors, not the quantity of them. The question in joint employment cases is not whether the worker is more economically dependent on the independent contractor or the grower, with the winner avoiding the responsibility as the employer. As I mentioned, it's the quality, not the quantity of the factors. In addition to the supervision and control, I think it's very important to look at where the work was done. The work was not just done on the airplane. The work was done in Air France's office in the Ogden kitchen, which Ogden made available to Air France. It was also done on the Dynair premises, which Air France made available to Dynair. If it had not been for Air France, Dynair could not have leased that land by itself prior to February of 1918. In other words, if the airport had made that property available to Dynair, they'd have gotten it themselves. They wouldn't do that, so Air France got it. So that tells you the airport's in control. These people aren't. Well, but what it tells you, Your Honor, is that Air France sublet it for the purpose. Air France leased it from the airport for the purpose of providing it to Dynair, which in my mind means that we needed Dynair to be there. And we're not talking about a little bit of space. They're not hiring people to do things they don't need. In other words, you can attribute a lot of motives to Air France, but throwing money away wouldn't be one of them. That's right, Your Honor. But in terms of where the work is done, I just wanted to make the point that there is that 9,000 square feet of space. Air France also has its own office on the AeroGround premises with its own logo. Another airline had their logo on the same place, didn't it? No, the Air France logo is the only one that's on that particular office, I believe, Your Honor. Isn't there one building that pointed out Air France has a logo on it, but another airline has a logo on it too? I'm not sure about that, Your Honor. All right. I'm not either. I'll have to look and see. If you were to look at the duration and permanence of the relationship between Air France and the ground handling service company employees, you'll find that they have long-term contracts with one another. If you were to look at the integral nature, and that's probably the key to this case, whether Air France could actually perform the services it needs to perform without ramp and handling services, without catering, without cargo, I think you will find that Air France would not be able to provide the service that it does. And, in fact, it so much. Is that critical? In other words, they needed people for an hour a day to do a certain task, and those people go work seven hours a day for somebody else. But does the fact that Air France needs people on the ground every place it goes, does that say that all of these people are joint employees or some of them are simply because Air France needs those services? If the services are integral, that is an important factor that this circuit and the Antinor case has looked at. That is a very important factor. And, again, it's not all the employees of the ground handling service company. You only need seven. We only need seven. Do you identify them by name? We don't identify them by name. Because it doesn't matter, does it? It doesn't matter, Your Honor. Because the company that employs them decides who comes over there and does it and fires them if they don't do it well. That's correct. Now, is there anything in the record to show what percentage of their time they spend with Air France? Tasks and not others. Yes, Your Honor. Reuben Martin, for example, spent five to six hours a day. And he stated that in his declaration. It's the same page that I cited to you before. There are AeroGround employees that were dedicated to work 100% time on the Air France account. And that's in the testimony here. I believe I have used up all my time. Thank you. Thank you. We'll hear from Air France. May it please the Court, my name is Elaine Jacoby, and I represent Air France, Joseph P. Ballou, and especially a peer for Howard Weiser. Your Honors, just to put this in context, the basic issue here is whether Mr. Moreau was eligible for FMLI leave, given the fact that the statute, as written, excludes employees who are employed at the work site of an employer who has less than 50 employees at that work site or within 75 miles. Now, there was a preliminary issue here, which Ms. Hsu has not addressed, which was whether or not Air France has 50 employees at the San Francisco airport, which is where Mr. Moreau worked. In the submissions, in the brief, they have contended there is a factual dispute as to that, and it is our contention that there is no evidence to support their claim that there are any more than the 42 or 43 employees that were identified within 75 miles of San Francisco. Their argument is that these Dynair, Ogden, AeroGrand, et cetera, ought for the purposes of this statute to be counted and added to that 42 or 43. That would take you over the top for the purposes of this statute. That's right, Your Honors. That's why I just simply want to make it clear that we do not believe there's any factual dispute with respect to the number of employees that Air France employs. And also to clarify the point that it is for purposes of finding Mr. Moreau's eligibility for MFLA leave that they raise the joint employment issue. Can I ask you about AeroGrand specifically? Yes. Because I find them a little bit different in nature than the people who clean the plane or supply the food. The agreement actually required AeroGrand to dedicate a certain number of people, including supervisors, to work for Air France. Is that right? Well, what the agreement does. Of course, one dedicated supervisor, two customer service agents, and five warehouse personnel, right? What the agreement does is to say there are a certain number of people needed to fulfill the services, to carry on the services of setting up, of booking freight, loading it, and so forth. It doesn't matter who those people are. They are entirely under the control and supervision of AeroGrand. They work on AeroGrand's premises. AeroGrand decides when they want to move somebody out of that function and so forth. All that the contract says is that this number of people is needed, in our opinion, to actually fulfill the task. And there was a full-time Air France employee, Mr. Richard? Mr. Richard is the only, well, he was for a period of time, the only Air France person dedicated. He was the cargo operations manager? Yes. And he worked right with these AeroGrand people, right? His role, Your Honor, is like that of the supervisors of all of the Air France employees to perform quality control functions. And in that regard, for example, Ms. Hsu raises an issue of training. One of the things that Mr. Richard had to do was to determine that, in fact, the employees that were assigned to work on the AeroGrand, on the cargo handling, had had adequate training in order to pass required tests to show that they could handle dangerous materials. So what he did was simply check off. Did they have this training? He monitored it, gave them some additional training when necessary. He did not determine, and this is very important, it is part of the record, he did not determine anything that a supervisor ordinarily determines about employees. He didn't determine who they were, number one. He didn't even have records with respect to that. He didn't determine what their schedules were. He didn't say they have to work overtime. Did he admit in his deposition that he supervised them? No, he did not. What he did was to say that he performed a quality control function. Ms. Hsu, in questioning him, asked him what the word supervision meant, and he meant that it was simply to follow through in determining that they were doing, meeting the specifications of Air France. Now, what I want to go to, Your Honors, is that, first of all, with respect to the regulations, the regulations, as Ms. Hsu has said, with respect to joint employment, give some, I think, very clear guidance about how to determine whether someone is a joint employee or not. One of the things that is unique in this regulation, 825.106, is that the Department of Labor has suggested the kind of relationship, the kind of employment relationship that it's looking at, and it is looking at the kind of relationships where one company supplies people to another company and essentially places them under the control of that other company. Can we tell from the record, I'm still mentally on AeroGround, can we tell from the record that's available whether the same AeroGround employers or any of them worked constantly over any extended period of time? Yes, Your Honor, there was extensive testimony by Mr. Richard, and it's also, I believe, stated in his, it may be in his declaration, but certainly in his deposition, there was a great deal of turnover at AeroGround. People were promoted and sent off to work for other companies. And that goes, for example, to the issue that was raised by Judge Hill. Here's my question. Assume you've got five people, Sam Smith, et cetera, a total of five people. Did those same five people from AeroGround work for Air France over any extended period of time, or did those individuals keep changing? Those individuals kept changing, and they were not changed by Air France's direction or request. That was something that was entirely up to AeroGround. If they wanted to send those people, they wanted to promote them, they wanted to send them off someplace else, they did so. If Mr. Richard thought an AeroGround employee was doing a particularly bad job, was he empowered to directly interface, or did he go to someone from AeroGround indirectly? He couldn't do anything, Your Honor. The record is very clear that he had no power to discipline. In fact, there was extensive discovery on this issue. Does the record tell us what happened? Because we all know there are people who sometimes don't do their jobs. What happened when an AeroGround employee was not performing to the standards that Air France thought it had contracted for with AeroGround? Your Honor, I don't want to, you know, be difficult, but there simply is nothing in the record because Mr. Richard did not do anything in that regard. He did not say. He never made a judgment some individual is not doing a job. He simply didn't make that judgment, and he didn't do anything that would interfere with the way that AeroGround. If you're down there with the cargo and there's a guy throwing people's bags on the floor, kicking the bags or whatever, he would do nothing. Number one, he didn't supervise those people. He was in an office setting checking off essentially paperwork kinds of things. Okay, and if that paperwork saw a spike up in lost luggage and complaints by Air France passengers, what did Mr. Richard do? He would talk to the supervisor of AeroGround. One of the things that is clear from the contract itself is there's a dedicated supervisor of AeroGround people who is the one who's in charge. And Mr. Richard, as the quality control person, would go to that person and say, you know, some item has been lost. People are complaining. You have to take care of this. Didn't he have a monthly meeting with that supervisor to go over how well the supervisor's people were working? He did have monthly meetings to go over how the entire operation was working. If there had been, as your colleague has suggested, something that was lost, then he dealt with that through the supervisor. His function was solely as quality control, and that is true of the other Air France personnel who dealt with these employees of the service companies. You're telling us that based on your understanding of the record, there's not a single instance in which a regular employee of Air France ever exercised direct supervision over the performance of job duties of any of these AeroGround, Dynair, whatever? Never happened. I am saying that when you use supervision as you have used it and as I would use it. I mean telling them how to do their job on a day-to-day basis. On a day-to-day basis? One-to-one, going down there and saying, no, that's not the way we prepare cordon bleu for our passengers. This is the way we do it. Now, your Honor, when it comes to the quality control function with Ogden, that was the caterer, what Mr. Moreau has alleged is that he himself, who was the assistant manager of Air France, on occasion would tell people in his role, which was to check to see whether trays looked proper, whether food was properly cooked and so forth, that he would say, no, that's not right. It shouldn't be there. But he himself admits that he could take no action with respect to any individual. He simply had to go to the supervisor of Ogden and tell them, there is a problem with the way the bread is being cut. You've got to take care of this. And that's what was done on a sometimes, a couple of times a week, sometimes less frequent basis. But what I would like to point out, your Honors, is that this is the only area in all of the factors that have been dealt with by the courts that the court below found any kind of interaction, really, between Air France and these employees of the service companies. In all other respects, there is no even interaction. They don't know who these people are. They come onto the plane or onto the tarmac around the plane for limited periods of time. These companies, AeroGround, Ogden, and Dynair, are not in the business of supplying people. They are in the business of supplying services. And those services are dependent on those companies making major capital investments in premises and equipment and in training their people, in developing an administration for their people. These are industries. You're saying that this situation is factually, dramatically different. For example, if there was, I'm making this up, a thing called Air France Express, where passengers got off of flights from Paris and got onto smaller jets that were going to Fresno or Modesto that said Air France Express, and the pilots had Air France Express uniforms on. And it turned out that Air France had a contract with Ryanair to run Air France Express. You'd concede that that hypothetical would meet the FMLA regulations. Yes, that would be something where people were being supplied. In this case, note, all of those people, Ogden, Dynair, et cetera, they all wear their own uniforms. They know who they work for. And the key thing, all of the factors that Ms. Hulis talked about, you can go through them all, but what they all go to is the issue of economic dependency. On whom are these service workers economically dependent? None of them are dependent on Air France. In fact, the question was asked, and there were declarations submitted to the court, wherein employees, including Ruben Martin, who was quoted by Ms. Hulis, said, I'm not dependent on Air France when Air France in fact terminated the contract with Ogden. And Ogden, by the way, has a collective bargaining agreement and deals with its employees based on that. But when that contract was terminated, Mr. Martin went on. He was never terminated. All Ogden had to do was to look for another client to fill the time slot that they spent preparing food for Air France. Yet on the other end of the sort of thing, the temporary talent people, they supply workers to go and work in the office of or on the production line of their customers under the supervision of the customer quite often, don't they? Yes, that's correct, Your Honor. Now, is that different from what we have here? Absolutely, absolutely. In fact, that's the example that the Department of Labor used of the situation that we're looking at, where the purpose of the statute is very much impacted by that kind of situation. The purpose of the statute is to guarantee a certain amount of leave to eligible employees. I think some companies nowadays have been actually contract for and operate complete departments. Maybe an accounting department is contracted and it works in the corporate offices of the company. It's auditing, if I'm not using a bad word. And they would be different from this, I take it. Yes, that's the same kind of operation that is discussed by the Department of Labor and the regulations. They are saying if you as an employer decide to contract with another company to bring in, let's say, 30 or 40 employees, to do the jobs that you would ordinarily have to hire people to do and put them on your payroll, then you can't escape the obligations under the statute to provide leave to your employees because those people should be counted and now you've got more than 50. But what we are saying is that was not what Air France was doing. Air France was not out seeking employees, seeking people to take over an existing function, a department. They bought services and they don't care who provides, who individually provides those services. For example, Ms. Hsu said something to the effect that we would say we need four cleaners. That's not correct. The record doesn't support that. It was depending on the time available to dine air. Sometimes a plane comes in late. They've got to clean the plane faster than they would ordinarily in order to meet the schedule. So they decide, okay, we're going to send 15 people today rather than 10 people. That's entirely up to them. And then when and if there is any delay in the flight, and this is a distinction that I wanted to clarify for you particularly, Judge Hill, because you raised the question about the contract. The contract simply says that if there's a delay, you have a grace period of an hour for the rate that is being paid for your services. What we do is we pay you X for taking care of a particular kind of aircraft, and you have a grace period of an hour beyond the scheduled departure time. If the flight is delayed more than that, then you're going to have to pay us X plus. And the rate is couched in terms of what it would cost dine air to pay people on an overtime basis, but there's no evidence in the record that those people are actually paid overtime because if they are now into a new eight-hour schedule, they'll bring in people from that area. They'll get the money from Air France, but we don't know what they pay to their employees, and we don't care as long as they get the job done. All right. Thank you. Your Honor, may I have a minute? You may have one minute. Thank you. Your Honor, you're absolutely right. Mr. Richard testified that he supervised the air ground employees, and as a matter of fact, Mr. Ballou, who was the station manager, also testified that Air France personnel supervised the air ground employees. With regard to your question about whether there's any Air France personnel that tells any of the route handling service company employees what to do, and I would refer you to page 17 of our opening brief, and it says, citing to Rosemary Goinesh, Air France personnel person, she testified before the crew or passengers could begin boarding the plane, the plane had to be perfect. It was, quote, easier to get cleaners to fix the problem immediately before they leave instead of having them return later. She checked the cleanliness of the aircraft and the bathrooms on a daily basis, and this shows that Air France personnel told people what to do when it wasn't to their liking. Didn't they tell them whether it had yet been done? I'm not sure. The cleaning had yet been done. They said it's not yet clean, and your company has contracted to clean it. That's right, that the cleaning wasn't done perfectly to Air France's standards is what the significance of that is. But clean is clean, isn't it, or do we have to parse the meaning of another word? I think Air France may have a certain definition of what clean is. Just with regard to the payroll records, the only dispute, there's a factual dispute the plaintiff raises as to whether there are more than 43 employees based on the 72 names that are on those payroll records. We just don't have enough information to ascertain whether there should be more than 43 because we don't have the transfer dates. But I think, Your Honor, you can rule as a matter of law on this issue, and on behalf of my client, I would like to thank you for your time and attention. Thank you. Thank you.
judges: Hill, Tg Nelson, Hawkins